**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS K. BEGESKE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 09-cv-4009 |
| | ) | |
| GENERAL TEAMSTERS UNION, LOCAL 673, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter arises out of the failure of Defendant General Teamsters Union, Local 673 ("Local 673") to file a timely notice with Plaintiff's employer, UChicago Argonne, LLC, of its desire to reopen the collective bargaining agreement between Defendant and UChicago Argonne to renegotiate wages for Plaintiffs. Plaintiffs filed a one-count complaint alleging breach of the duty of fair representation. Both parties have moved for summary judgment on the issue of liability [68 & 74], Plaintiffs have moved to deem requests to admit admitted [72], and Defendant has moved to strike Plaintiffs' reply [87]. For the reasons set forth below, the Court denies Plaintiffs' motion to deem requests to admit admitted [72], denies Defendant's motion to strike [87], and denies Defendant's motion for summary judgment [68]. The Court grants Plaintiffs' motion for partial summary judgment [74].

## I. Background

Defendant General Teamsters Union, Local 673 ("Local 673") operates as a "labor organization" under the Labor Management Relations Act of 1947 ("LMRA"). Plaintiffs are employed by UChicago Argonne, LLC ("Argonne"). Pursuant to a collective bargaining agreement ("the agreement") between Local 673 and Argonne, Local 673 is the exclusive

bargaining representative of Plaintiffs in their dealings with Argonne.  Plaintiff Thomas Begeske, a union steward with Local 673, was responsible for interacting with the union concerning labor disputes and the filing of grievances.  Javier Najera, Local 673's business agent, monitored and administered the collective bargaining agreement with Argonne.  Paul Hawkins was the president of the union, and Roger Kohler was the union's business manager, secretary-treasurer, and principal officer.  Both Kohler and Hawkins were elected to their positions in November 2007.

Section 17.2 of the collective bargaining agreement between Local 673 and Argonne contained a two-year wage-reopener clause which stated:

> Notwithstanding the preceding sentences in this Section 17.2, the Union or the Laboratory may reopen Appendix A for the purpose of negotiating basic hourly rates to be effective on March 9, 2009 and March 8, 2010.  This Agreement will be reopened for such purpose only if either party notifies the other in writing at least sixty (60) calendar days prior to March 6, 2009 that it desires to reopen the Agreement.  Failing receipt by either party of such written notice prior to said sixty days, this Agreement shall continue in full force and effect until its expiration date.

Local 673 negotiated the agreement with Argonne on behalf of its members and customarily reopened collective bargaining agreements containing wage reopener clauses.  Although nothing in Section 17.2 guarantees that Argonne will give the union a raise as a result of any negotiations, Darryl Howe, the manager of employee relations at Argonne, testified that the only period when the union did not receive a raise was during a federal wage freeze in 1993.

The union relies upon a computer system, the Titan System, to administer contracts, update membership lists, and keep track of dues payments. The Titan System was in place prior to Hawkins and Kohler taking office in January 2008, and the union historically has relied on the system for these tasks.  The Titan System is not networked to other computers in Defendant's office; rather, it is connected to the Teamsters' International Office in Washington, D.C.  To

access information on the Titan System, one runs a query on the database. Unlike certain calendar and e-mail software programs such as "Outlook," there are no event driven individual "pop-up" notifications that one receives when signing into the Titan System. Reports produced on the Titan System contain columns for the start date and the end date of a CBA, but there is no database or search column for information relating to a wage reopener.

Kohler, along with two secretaries, had access to the Titan System. Kohler's duties included sending out notices of CBA renewals and wage reopeners. It was Kohler's regular practice to process wage openers the first or second week of the month, because "virtually all" of the union's other collective bargaining agreements have expiration dates at the end of the month. His assistant would print from the Titan System monthly a list to keep track of employers with upcoming contract expirations. These reports do not include or identify contracts that have mid-contract or mid-term wage reopeners. Kohler testified that contracts or wage reopeners generally expire at the end of a month, but that a few contracts may expire in the middle of the month. It is undisputed that the Argonne collective bargaining agreement required Local 673 to notify Argonne on or before January 5, 2009, that it desired to reopen the agreement to negotiate wages.

In late November or early December 2008, Begeske called Najera and reminded him that the time to give notice pursuant to the wage reopener clause would expire shortly. Najera, as a business agent, does not personally send a notice to employers of the union's intent to renegotiate a collective bargaining agreement or wage reopener. Begeske did not call anyone else from the union to remind them of the wage reopener, but Najera testified (and Defendant admits) that Najera relayed the information about the upcoming deadline for the Argonne contract to Kohler, whose job it was to keep track of the wage opener dates. Kohler told Najera

that the contract would pop up in the Titan System. On January 4 or 5, 2009, Begeske called Najera a second time and asked whether or not the union had sent the wage reopener letter. Najera again told him not to worry.[1] After the conversation with Begeske in January 2009, Najera again told Kohler that the notification needed to be sent out. Despite these reminders and the common practice of reopening agreements, Local 673 failed to notify Argonne on or before January 5 that it desired to reopen the agreement and negotiate wages. Instead, the union notified Argonne on January 14, nine days after the deadline.

In late January, Argonne informed Defendant that Argonne would not reopen the agreement because Defendant had missed the deadline. This was the first time that the union and Kohler had sent a late notice either to renew or reopen a contract for negotiations. On January 24, both Kohler and Najera sent letters to a labor and employment attorney at Argonne, asking Argonne to reconsider its denial of the union's request to reopen negotiations, based on what the union dubbed a "clerical error." In his letter, Kohler stated,

> I value and respect the ability my staff to handle their responsibilities in a professional manner. Every manager has delegate to his staff, but I am ultimately responsible for any such failings in their work. We have hundreds of contracts at this Local and this procedure has been done flawlessly to date. This was a clerical error. Virtually all of our contracts end at the end of the month. The 60 Day limit came 1 day after the return from the Holidays. My staff person, Business Representative, and I are devastated by the implications of this error.

Najera, in his letter, stated that he "would like to formally apologize for my untimeliness in sending the request for reopening wages in order to renegotiate." He also told Argonne that Begeske informed him of the expiration date being 2009 for wages and that he "immediately had the notification sent." However, during his deposition, Najera admitted that he did not have a notification sent to Argonne. He also explained in his deposition that it was not his error, and

---

[1] It is undisputed that Begeske never informed Najera of the specific date (January 5) by which the notice had to be sent in order to comply with the wage reopener terms.

that he wrote this to take responsibility for the union's error.  After receiving these letters, Argonne agreed to meet with union officials; however, they ultimately refused to reopen the CBA to renegotiate Plaintiffs' wages.

On May 20, 2009, Argonne notified Defendant that it would have negotiated the wages in good faith if Defendant had timely requested to reopen the agreement.  On previous occasions when Defendant and Argonne negotiated wages pursuant to a wage reopener clause, union members have received between 2.8% and 3.2% raises per year.  Plaintiffs did not receive a raise in 2009 or 2010.  As a result of Defendant's failure to timely file a request to reopen the agreement, Plaintiffs filed a one-count complaint against Local 673 for breach of the duty of fair representation.

## II.    Miscellaneous Motions

### A.    Plaintiffs' motion to deem requests to admit admitted

On November 16, 2009, Plaintiffs served Defendant with a copy of Plaintiffs' First Set of Requests to Admit, along with Plaintiffs' First Request for Production of Documents and Plaintiffs' First Set of Interrogatories.  Federal Rule of Civil Procedure 36 states in pertinent part: "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney. A shorter or longer time for responding may be stipulated to under Rule 29 or be ordered by the court." Fed. R. Civ. P. 36(a)(3).  Defendant failed to respond to Plaintiffs' requests within 30 days, or on or before December 16, 2009.  However, Defendant answered Plaintiffs' requests on January 18, 2010.

On May 27, 2011, 16 months after Defendant answered Plaintiffs' requests, Plaintiff filed a motion to have the requests deemed admitted because Defendant was approximately one month

late in responding to the requests. Plaintiff has not demonstrated any prejudice as a result of Defendant's failure to submit its responses within thirty days, particularly given that a motion to dismiss was pending before the Court during the time Defendant's responses were due. Moreover, waiting until 16 months after the requests were due to complain about untimeliness does nothing to help Plaintiff's cause. Finally, any facts that Plaintiff seeks to have admitted that are relevant to the summary judgment motions are not disputed. Plaintiff's motion is denied.

### B. Defendant's motion to strike

Defendant seeks to strike pages 2-9 of Plaintiffs' reply brief in support of their motion for summary judgment because Plaintiffs' reply allegedly contains arguments that constitute an improper surreply on three issues raised in Defendant's motion for summary judgment. The three issues relate to Defendant's arguments that 1) Plaintiffs failed to establish subject-matter jurisdiction, 2) Defendant's conduct did not impact a minority of the Plaintiffs' within the bargaining unit, and 3) Plaintiffs are not entitled to attorneys' fees. Contrary to Defendant's position, Plaintiffs properly responded to Defendant's arguments, as Defendant offered each of the three arguments identified above against Plaintiffs' motion for summary judgment in Defendant's brief filed on June 17, 2011. In other words, Defendant used these arguments to support both a denial Plaintiffs' motion for summary judgment and a granting of Defendant's summary judgment motion. Each side filed two memoranda in support of their motions for summary judgment (an opening brief and a reply) and each brief addressed substantially the same issues. Plaintiffs' reply was entirely proper. Defendant's motion is denied.

III.    **Analysis**

A.    **Legal Standard**

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a).  On cross-motions for summary judgment, the Court construes all facts and inferences "in favor of the party against whom the motion under consideration is made." *In re. United Air Lines, Inc.,* 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.,* 394 F.3d 530, 536 (7th Cir. 2005)); see also *Gross v. PPG Industries, Inc.*, 636 F.3d 884, 888 (7th Cir. 2011); *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004).  To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence in support of the opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

### B.    Duty of Fair Representation

Congress enacted § 301 of the LMRA in order to impose "a higher level of responsibility" upon parties involved in collective bargaining agreements.  *Hines v. Anchor Motor Freights, Inc.*, 424 U.S. 554, 559 (1976).  Because the collective bargaining system "subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit" (*Vaca v. Sipes*, 386 U.S. 171, 182 (1967)), a bargaining agent has "the responsibility and duty of fair representation." (*Humphrey v. Moore*, 375 U.S. 335, 342 (1964)). The duty of fair representation requires a union to satisfy all members' interests without hostility or discrimination, to exercise its bargaining power in good faith and honesty, and to refrain from arbitrary conduct.  *Id*. at 342.[2]

Defendant argues that Plaintiffs cannot establish a claim because "the duty of fair representation does not run to the majority."  Def. Reply at 6.  Defendant contends that its actions had an identical impact on each member of the bargaining unit and therefore it did not hinder a minority preference.  In other words, because one individual Plaintiff was treated no differently than any other Plaintiff, there is no differential treatment to a minority interest and thus no claim.  Not surprisingly, Defendant does not cite to any authority which supports this

---

[2]  Defendant first argues that Plaintiffs' case should be dismissed for lack of subject-matter jurisdiction because the claim does not involve a violation of the collective bargaining agreement between Defendant and Argonne.  Given the facts admitted in this case as well as controlling Supreme Court and Seventh Circuit precedent, this argument is without merit.  See *Nelson v. Stewart*, 422 F.3d 463, 470 n.5 (7th Cir. 2005) ("Of course, it also has been recognized that fair representation cases are grounded in federal law and are within the federal question jurisdiction of the district court").  Defendant's alleged arbitrary behavior in failing to reopen the negotiations in a timely manner is premised on Section 17.2 of collective bargaining agreement and the union's past practices in conformity with the agreement.  See, *e.g.*, *Communications Workers of America v. Beck*, 487 U.S. 735, 743 (federal jurisdiction "to adjudicate fair-representation claims encompasses challenges leveled * * * at a union's contract administration and enforcement efforts").  To the extent the union had a duty of fair representation to Plaintiffs, that duty and the obligations attendant with that duty are defined by the collective bargaining agreement and therefore are governed by § 301 of the LMRA.  Defendant can (and does) argue that the duty of fair representation does not encompass the facts of this case, but the inquiry is directed at the merits of the claim, not whether jurisdiction exists for the claim alleged by Plaintiff.

theory. The cases cited by Defendant do not support a theory that a minority of members of a bargaining unit must be affected by a union's alleged arbitrary conduct to have a claim and the Court knows of no such requirement that only a numerical minority can bring a claim against a union for violating the duty of fair representation. Under Defendant's rationale, if white leadership discriminated against black union members, the union could do so with impunity if the majority of the union was black, since, according to Defendant, a claim for duty of fair representation cannot be made when a numerical majority of the union members are wronged by the union. But a union has "a statutory duty fairly to represent all of those employees, both in its collective bargaining * * * and in its enforcement of the resulting collective bargaining agreement." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). In any event, Plaintiffs in this lawsuit are only a portion of the employees that the union represents. As noted by Kohler in his letter to Argonne, the union has "hundreds of contracts at this Local and this procedure ha[d] been done flawlessly to date." Thus, it was only this set of union members (a minority of the union at large) that the union's conduct adversely affected.

The power that a union has to exclusively represent all employees entails "a concomitant duty of fair representation to each of its members." *Cleveland v. Porca Company,* 38 F.3d 289, 295 (7th Cir. 1994). The Supreme Court in *Air Line Pilots v. O'Neill,* 499 U.S. 65 (1991), set out a tripartite standard for determining whether this duty has been breached. "A union breaches its duty of fair representation if its actions are either arbitrary, discriminatory, or in bad faith" (*id.* at 67), and a court should look to each standard separately when determining whether a union violated its duty. See also *Garcia v. Zenith Electronics Corp.,* 58 F.3d 1171, 1176 (7th Cir. 1995); *Rakestraw v. United Airlines,* 989 F.2d 944, 945 (7th Cir. 1993). Prior to *Air Line Pilots,* the Seventh Circuit defined the duty of fair representation very narrowly, requiring the plaintiff

to prove that the union conduct was "intentional, invidious, and directed at the employee." See *Hoffman v. Lonza, Inc.,* 658 F.2d 519, 520 (7th Cir. 1981). However, in *Air Line Pilots*, the Supreme Court rejected the Seventh Circuit's reading of the duty of fair representation. See 499 U.S. at 74-76. The Supreme Court determined that the union's actions must not only show "good faith and honesty of purpose," but also must be within a "wide range of reasonableness," which includes "a prohibition against 'arbitrary' conduct." *Id.* at 76; see also *Ooley v. Schwitzer,* 961 F.2d 1293, 1302 (7th Cir. 1992).

While arbitrary conduct is a breach of a union's duty,[3] the test for determining whether particular conduct is arbitrary can be quite forgiving. *Trnka v. Local Union No. 688,* 30 F.3d 60, 61 (7th Cir. 1994). Courts "should not substitute their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call." *Ooley,* 961 F.2d at 1302. Thus, a union's actions are considered arbitrary only if "in light of the factual and legal landscape," these actions are "so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots,* 499 U.S. at 67. "[O]nly an egregious disregard for union members' rights constitutes a breach of the union's duty." *Castelli v. Douglas Aircraft Co.,* 752 F.2d 1480, 1483 (9th Cir. 1985). At least one sister circuit has noted that "[a] union acts arbitrarily by failing to take a basic and required step." *Vencel v. International Union of Operating Engineers, Local 18,* 137 F.3d 420, 426 (6th Cir. 1998) ("Timely filing is both basic and required.").

Plaintiffs allege that Defendant acted arbitrarily when it failed to send the wage reopener notice to Argonne prior to the deadline for doing so. The parties do not dispute the material facts in this case, including that (1) it was the policy of Defendant to re-open collective bargaining

---

[3] Plaintiffs' sole argument is that Defendant acted arbitrarily in failing to send in the notice. Plaintiffs have not argued that Defendant acted in bad faith or with a discriminatory purpose. In any event, whether or not a union's actions are discriminatory or in bad faith calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive. The record before the Court lends no support to the possibility that the union had an improper motive.

agreements to negotiate wages for all of their contracts, including the Defendant's collective bargaining agreement with Argonne; (2) Defendant failed to notify Argonne prior to the deadline of January 6, 2009, that Defendant wished to re-open its agreement with Argonne to negotiate wages for Plaintiffs; (3) prior to January 6, 2009, Thomas Begeske reminded Najera twice that the deadline to send a notice was approaching soon and Najera in turn notified Kohler, who was responsible for notifying employers if the union wished to renegotiate wages; (4) Argonne informed Defendant on May 20, 2009, that it would have negotiated wages in good faith if Local 673 had timely filed the request to re-open the Agreement; (5) "virtually all" of the union's contracts expire at the end of the month and therefore Kohler would run the reports closer to the middle of the month (after the expiration date to reopen wages in the Argonne contract); and (6) all of the other contracts with end of the month or middle of the month expiration dates were processed in a timely fashion. As it is undisputed that Defendant missed the deadline, the only issue is whether Plaintiffs have established that Defendant acted arbitrarily when it failed to ensure that timely notice was sent to Argonne. *Air Line Pilots*, 499 U.S. at 67.

Here, Defendant's "rational basis or explanation" for why it missed the wage reopener deadline was that the union's computer system did not notify it in a timely fashion and thus a "clerical error" occurred. Kohler, who was in charge of notifying Argonne and who had knowledge at least that the deadline was approaching (if not of the actual date), explained that the failure to send the notice on time was due to a "clerical error." When asked what the clerical error was, Kohler stated, "I don't know, other than the fact it wasn't done on time." Similarly, Najera testified that he could not state what the union's error was because he had nothing to do with sending out the letter. Defendant also blames the mistake on a lack of experience with this type of contract (which had a deadline at the beginning of the month rather than the middle or

11

end) and contentious union elections in 2007, which resulted in a less-than-smooth transition to new union leadership. Based on the evidence in the record, it seems safe to infer that Kohler or one of his assistants simply forgot to send the notice because (1) they expected the Titan system to remind them and (2) it failed to do so. The question remains whether this constitutes mere negligence, something "more than" mere negligence, or arbitrary conduct.

Defendant's explanation—that it forgot to send the letter because the computer system failed to alert Kohler to the impending deadline—certainly would be more understandable if Begeske had not twice warned Najera, who in turn warned Kohler, that the deadline was approaching. Although Begeske did not tell Najera the exact date that the notice should be sent, he did remind Najera twice of the approaching deadline. As noted previously, at least one sister circuit has held that "[a] union acts arbitrarily by failing to take a basic and required step. Timely filing is both basic and required." *Vencl v. International Union of Operating Engineers, Local 18*, 137 F.3d 420, 426 (6th Cir. 1998). However, the Supreme Court and the Seventh Circuit have held that "mere negligence, even in the enforcement of a collective-bargaining agreement, [will] not state a claim for breach of the duty of fair representation." *United Steelworkers of America, AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 372-73 (1990); see also *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369-70 (7th Cir. 2003) ("simple negligence is not enough to establish a breach of fiduciary duty"). The parties have not cited, nor has the Court found, any case arising under similar circumstances that draws a distinct line between "mere negligence" (and therefore no breach) and gross negligence or arbitrary action (or inaction) such that the union has been found to have breached the duty of fair representation.

Given the dearth of authority involving these exact circumstances,[4] an examination of the policy behind the duty of fair representation provides a better understanding of Plaintiffs' claim and Defendant's arguments opposing it. Negligence, possibly even gross negligence (it's not clear from binding precedent), is not "unfair" representation. *Antrim v. Burlington Northern, Inc.*, 847 F.2d 375, 378 (7th Cir. 1988). Representation can be "fair" even if ineffectual. *Id.* Unless the union's hierarchy is out to get the complaining members—perhaps on prohibited grounds such as race, perhaps because of political squabbles within the union—a failure to handle a matter skillfully or successfully usually is not a source of legal liability. Here, Plaintiffs do not claim that the union took their race, politics, or other prohibited criteria into account. Rather, they are aggrieved because the union failed to do a ministerial task for which it had responsibility. Thus, the union's actions do not evince discrimination or invidious conduct directed at this particular group of employees.

Yet this was a task that the union boasts to have completed "flawlessly" in every other instance. Defendant made a point of noting that most, if not all, of its contracts have expiration dates at the end of the month, and the union is never late on those contracts, at least in part because the manner in which the union officials use the Titan system provides an effective check as to those contracts. Yet, clearly, not all contracts expire at the end of the month or this lawsuit would not exist. The upshot of the union's procedures is that contracts that expire at the end of the month do not slip through the cracks, while the few (or possibly only the one) that expire near the start of the month do (or at least did in this instance), because the union's tracking mechanism does not account for contracts with expiration dates at the start of the month.

---

[4] The vast majority of the cases addressing the issue of whether a union official breached the duty of fair representation involve a union official's failure to file a grievance on behalf of a union member.

Given that the union officials have sole responsibility for sending out this type of notice, the union's failure in these circumstances cannot be attributed to the employees. See *Beck v. United Food and Commercial Workers Union, Local 99*, 506 F.3d 874, 881 (9th Cir. 2007) ("Because the individual interest at stake is strong and the union's failure to perform a ministerial act completely extinguishes the employee's right to pursue [a] claim, the union's failure to file the original grievance was not mere negligence") (quoting *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1274 (9th Cir. 1983)). Compare *Neal*, 349 F.3d at 370 (noting that the failure to file a timely grievance could not "fairly be ascribed to the union"). Furthermore, the union's conduct did not involve an "act of judgment," but rather was completely ministerial in nature. See, *e.g.*, *Peters v. Burlington N.R.R. Co.*, 931 F.2d 534, 539-40 (9th Cir. 1991) (noting that "'ministerial act' and 'act of judgment' represent * * * opposing points on a continuum that broadly attempts to separate discretionary decision making from inexplicable conduct"). A union's conduct that constitutes an exercise of judgment is entitled to deference even when the union's "judgments are ultimately wrong." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 46 (1998) (noting that the deferential standard for arbitrary conduct "gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong"). On the other hand, courts have referred to the failure to perform a ministerial or procedural act as an "arbitrary" action. See, *e.g., Vencl*, 137 F.3d at 426; *Galindo v. Stoody Co.*, 793 F.2d 1502, 1514 (9th Cir. 1986) (union representative's failure to notify employer that employee was a steward was arbitrary where the representative knew of impending layoffs); *Dutrisac,* 749 F.2d at 1274 (union's failure to file a grievance on time was arbitrary). Actions such as these have been found to breach the duty of fair representation where the act substantially injures the union member, such as where the union's action or omission

14

"completely extinguishes the employee's right[s]" (see *Dutrisac*, 749 F.2d at 1274) or "severely prejudice[s] the injured employee" under circumstances that do not further the policies underlying the duty of fair representation (*Marquez v. Screen Actors Guild, Inc.*, 124 F.3d 1034, 1043 (9th Cir. 1997) (internal quotations omitted)). Here, the union was not evaluating the merits of a potential wage increase, but rather failed to perform the ministerial act of giving timely notice of an intent to negotiate for the increased wages.

With respect to whether the interest at stake is significant, Argonne notified Defendant that it would have negotiated the wages in good faith if Defendant had timely requested to reopen the agreement. On previous occasions when Defendant and Argonne negotiated wages pursuant to a wage reopener clause, union members received between 2.8% and 3.2% raises per year. Because of Defendant's failure, Plaintiffs did not have the opportunity to receive a raise over the course of two years (2009 or 2010). And although the possibly exists that Argonne and the union may not have reached an agreement regarding a wage increase, that possibly appears remote, given the record evidence demonstrating that the only period when the union did not receive a raise was during a federal wage freeze in 1993. Thus, the Court finds the interest at stake to be significant.

Regardless of whether the union intended to discriminate against Plaintiffs (and it appears highly likely that it did not), the manner in which Defendant tracked (or failed to track) contract expirations reflects arbitrariness in the way that contracts are handled. Specifically, because the system on which union officials relied to track important information on all union contracts functions effectively as to ones with deadlines arising during the middle or end of the month, but not as to contracts with deadlines in the early part of the month, each contract does not get the same attention consistent with the duty of fair representation. Most contracts get due attention,

but as a result of a systemic failure of the union's own tracking procedures, the Argonne contract did not. This seems to be the very definition of arbitrariness. To be sure, if an effective tracking system were in place for all contracts and the officials responsible for implementing it simply had dropped the ball as to a deadline, Defendant would have a stronger argument that its act was "simple negligence" (*Neal*, 349 F.3d at 369-70) that is not actionable. But here the undisputed evidence in the record establishes that (1) shortcomings in the data contained in the Titan system itself, (2) the union officials' inaccurate understanding of the system, and (3) the way in which the responsible persons generated and used the available information on upcoming contract extensions all contributed to the union's failure to execute rights on behalf of one group of members that it was charged with executing for all members. And no blame can be laid at the feet of Plaintiffs; Begeske did what he could to alert union officials to the contract expiration date, but it was Kohler who had sole responsibility for sending out the notification. *Cf. Neal*, 349 F.3d at 370 (7th Cir. 2003) (noting that the failure to file a timely grievance could not "fairly be ascribed to the union"). In these rather unusual yet undisputed circumstances, the Court concludes that Defendant's handling of Plaintiffs' contract was arbitrary as a matter of law and that partial summary judgment in favor of Plaintiffs therefore is appropriate.

**III.**    **Conclusion**

For the reasons stated above, the Court denies Plaintiffs' motion to deem requests to admit admitted [72], denies Defendant's motion to strike [87], and denies Defendant's motion for summary judgment [68].  The Court grants Plaintiffs' motion for partial summary judgment [74].  The Court will resolve the question of attorneys fees after the issue of damages is resolved. This matter is set for status conference on February 14, 2012 at 9:45 a.m. in Courtroom 1919.


Dated:  January 31, 2012                    _____
                                            Robert M. Dow, Jr.
                                            United States District Judge